WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Derryberry, | No. CV-16-02462-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Daniel Derryberry seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying his application for benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure.  As discussed below, the Court reverses the Commissioner's decision in part and remands for further proceedings.

## I.  Procedural Background

In October 2012, Plaintiff filed an application for a period of disability and disability insurance benefits.  (Tr. 13.)[1]  Plaintiff alleged a disability onset date of April 20, 2010.  (*Id*.)  After the Social Security Administration (SSA) denied Plaintiff's initial application and his request for reconsideration, he requested a hearing before an administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision

---

[1]  Citations to Tr. are to the certified administrative transcript of record.  (Doc. 15.)

finding Plaintiff not disabled under the Act. (Tr. 13-24.) This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) *See also* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council). Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.   Administrative Record

The record before the Court establishes the following history of diagnoses and treatment of Plaintiff's alleged impairments. The record also includes several medical opinions.

### A.   Medical Treatment Evidence

#### 1.   Verve Chiropractic Group

On August 19, 2010, Plaintiff sought treatment for back pain at the Verve Chiropractic Group. (Tr. 300.) On examination, Plaintiff had a reduced range of motion with lumbar flexion and extension, and positive findings on the Dejerine's Triad, Minor's test, Escnterew's test, and on a straight-leg raising test. (*Id.*) Plaintiff could perform bilateral leg raise and heel and toe walk with pain. (*Id.*)

On May 9 2011, at an appointment with Nurse Practitioner (NP) Janine Sutter, Plaintiff complained of knots and cramping in his upper shoulders, migraines, and gastrointestinal (GI) problems. (Tr. 397.) On examination, NP Sutter noted tightness in Plaintiff's scapular region with two or three pressure points along the parascapular area. (Tr. 398.) NP Sutter noted that Plaintiff had an upcoming appointment with a gastroenterologist. (Tr. 397.)

On August 1, 2011, Plaintiff had an appointment with Helen Sava, M.D. (Tr. 394.) Plaintiff reported that prescribed medications had not improved his headaches. (*Id.*) Plaintiff reported that at home "cervical traction" improved his headaches. (Tr. 394.) He also reported that his irritable bowel syndrome (IBS) and gastroesophageal reflux disease (GERD) symptoms had resolved. (*Id.*) Dr. Sava changed Plaintiff's headache medication to Ketorolac. (*Id.*)

On October 31, 2011, Plaintiff had an appointment with Sean MacKenzie, D.C., at Verve. (Tr. 303.) Plaintiff complained of low back pain on the right side that was worse "after playing basketball this week" and with bending and lateral movement. (*Id*.) Plaintiff reported that his pain was "better with ice." (*Id.*) Dr. MacKenzie examined Plaintiff and reported that he had a normal gait and station. (*Id.*) He diagnosed Plaintiff with lumbar sprain, degeneration of the lumbar disc, and muscle spasm, and prescribed chiropractic manipulative therapy, traction, manual therapy, and stretching. (*Id.*)

During a February 7, 2012 appointment at Verve, Plaintiff reported that he had chronic low back pain and experienced three to four migraines headaches per week. (Tr. 380.) He stated that Imitrex did not relieve his migraines and Maxalt was not covered by his insurance. (*Id.*) Plaintiff was prescribed medication and referred to pain management for his pain complaints. (Tr. 381.) During a May 14, 2012 appointment at Verve, Plaintiff complained of chronic low back pain due to multiple disc bulges. (Tr. 386.) He stated that he could not afford further treatment for pain management. (*Id*.)

On March 7, 2013, at another appointment at Verve, Plaintiff complained of migraine headaches and lower back pain. (Tr. 378.) Plaintiff reported less pressure with headaches, but the same intensity. (*Id.*) Plaintiff was prescribed medications and advised to follow-up with neurologist Dr. Yasir Shareef. (Tr. 379.)

### 2. Banner Baywood Neurology

While receiving treatment at Verve, on August 2, 2011, Plaintiff also saw Hamid Mortazavi M.D., for headaches. (Tr. 287.) Plaintiff reported that he had weekly headaches that lasted at least an hour and caused pressure and throbbing. (*Id.*) Plaintiff reported that his headaches were "improving." (*Id.*) Plaintiff stated that exercise and stress aggravated his headaches. (*Id.*) Dr. Mortazavi opined that Plaintiff did not need prescription medication for headaches, but should avoid triggers for headaches. (Tr. 289.)

/ / /

### 3.      Dr. Yasir Shareef

On referral from Verve, on April 17, 2012, Plaintiff sought treatment from Dr. Yasir Shareef and reported migraines and back pain.  (Tr. 331.)  Plaintiff reported one to two headaches per day with nausea, phonophobia, and photophobia.  (*Id.*)  Dr. Shareef prescribed medication and ordered an MRI for Plaintiff's headaches.  (*Id.*)  An April 20, 2012 MRI of Plaintiff's brain showed "moderate mucosal thickening opacigying the petrous apex on the right ampatible with petrous apicitis and retention cysts."  (Tr. 342.)  The MRI was otherwise "unremarkable."  (*Id.*)

On May 15, 2012, and July 17, 2012, at appointments with Dr. Shareef, Plaintiff complained of leg pain, paresthesia, and headaches.  (Tr. 334, 335.)  Plaintiff reported "good pain relief with ice on his back."  (Tr. 334.)  Plaintiff reported having about six to eight headaches per week.  (Tr. 335.)  Dr. Shareef noted normal findings on physical examination.  (Tr. 334, 335.)  Dr. Shareef prescribed Tizanidine and physical therapy, and ordered an EMG on Plaintiff's legs.  (*Id.*)  On September 4, 2012, Plaintiff saw Dr. Shareef for headaches and back pain.  (Tr. 336.)  Plaintiff reported that his pain had not improved.  (*Id.*)

### 4.      360° Physical Therapy

On referral from Dr. Shareef, between July 18, 2012 and August 10, 2012, Plaintiff participated in physical therapy for lumbar pain at 360° Physical Therapy.  (Tr. 316-26.)  The initial assessment noted that Plaintiff had most recently hurt his back "wrestling a water heater."  (Tr. 316.)  On examination, Physical Therapist (PT) Lianne Rogers observed that Plaintiff had poor trunk strength, decreased lumbar lordosis, and muscle spasms in his lumbar paraspinals.  (Tr. 318.)  PT Rogers noted "fair tolerance" to treatment "causing limited ability to progress through the exercises."  (*Id.*)  Plaintiff's last treatment note from 360º Physical Therapy, on August 10, 2012, indicated that Plaintiff displayed fair tolerance to treatment and had made fair progress toward goals.  (*Id.*)  PT Rogers noted that Plaintiff's lower-leg extremity numbness was "abolished," but he continued to have poor trunk strength.  (*Id.*)

### 5.    Desert Valley Gastroenterology

Plaintiff also sought treatment from Dr. Steven Kaiser, a gastroenterologist, on May 11, 2011. (Tr. 238.) Plaintiff reported constipation, abdominal pain, and dysphagia to solids and liquids. (*Id.*) Dr. Kaiser diagnosed GERD and possible IBS. (Tr. 239.) Based on Plaintiff's complaints of abdominal pain, Dr. Kaiser ordered an upper and lower endoscopic examination. (Tr. 240.) An upper endoscopy with biopsy and colonoscopy with biopsy was performed on May 26, 2011, and showed internal hemorrhoids. (Tr. 242-43.) Dr. Kaiser recommended treatment for IBS and "anti-reflux precaution." (*Id.*) On April 27, 2012, Plaintiff followed up with Dr. Kaiser regarding stomach pain. (Tr. 311.) Plaintiff reported pain, diarrhea, and abdominal discomfort with fullness. (*Id.*) Dr. Kaiser diagnosed abdominal pain and GERD. (Tr. 311-12.) Dr. Kaiser ordered another upper and lower endoscopic examination. (Tr. 314.)

### 6.    Desert Spine and Sports Medicine

Plaintiff also received treatment for back pain at Desert Spine and Sports Medicine (DSSM). On February 2, 2011, Plaintiff had medial branch blocks at left L3, L4, and L5. (Tr. 598.) On February 23, 2011, Plaintiff again had medial branch blocks at left L3, L4, and L5. (Tr. 596.) On March 16, 2011, Plaintiff had radiofrequency ablations to the left L3 and L4 medial branch nerves and L5 dorsal ramus. (Tr. 594.)

On May 4, 2011, Plaintiff had an appointment with Physician Assistant (PA) Courtney McDaniel at DSSM. (Tr. 591.) Plaintiff reported that his pain had improved "70-80%" since his March 16, 2011 radiofrequency ablations. (*Id.*) However, Plaintiff complained of low back pain and dull pain that radiated to his left gluteal area, and stated that he could not "endure sustained activity due to back pain." (*Id.*) On physical examination, PA McDaniel observed that Plaintiff had an antalgic gait, poor balance with single-leg stance bilaterally, and a moderately limited range of motion, but was "nonpainful in flexion." (Tr. 592.) Plaintiff had full motor strength, could heel and toe walk, and had a negative straight-leg raising test. (*Id.*) PA McDaniel diagnosed Petitioner with lumbar spondylosis and lumbar degenerative disc disease and

recommended physical therapy.  (*Id.*)   She referred Plaintiff to Mesa Endurance Rehabilitation.  (*Id.*)

During a July 5, 2011 appointment with PA McDaniel, Plaintiff reported that he attended three physical therapy appointments before the termination of his workers' compensation coverage.  (Tr. 600.)  He reported that the pain in his left L3, L4, and L5 was "90% better" than his last visit.  (*Id.*)  Plaintiff reported that he had dull lumbar back pain that radiated to the left gluteal area.  (*Id.*)   Plaintiff stated that his pain was aggravated by lifting and excessive sitting, walking, and standing.  (*Id.*)   Lying down with his legs elevated or exercise improved Plaintiff's pain.  (*Id.*)  On examination, PA McDaniel noted that Plaintiff had full motor strength, a nonantalgic gait, and improved single-leg balance bilaterally.  (*Id.*)  Plaintiff had a "moderately limited but nonpainful" lumbar range of motion in flexion, but had "full and nonpainful" range of motion in "all other planes."  (Tr. 601.)  PA McDaniel limited Plaintiff to lifting no more than twenty-five pounds and advised him to continue home exercises.  (*Id.*)   On May 4, 2012, Plaintiff had an MRI of his lumbar spine that showed spondylotic changes of the lower lumbar spine, spinal stenosis at L3-4 and L4-5, and foraminal narrowing at L5-S1.  (Tr. 343.)

### 7.    Hospitalizations and Related Treatment

On March 31, 2013, Plaintiff was admitted to the hospital for right arm swelling and pain.  (Tr. 607.)  Dr. Mariana Liu diagnosed extensive right upper-extremity deep venous thrombosis (DVT), pulmonary embolism, hypertension, chronic back pain, migraine headaches, acid reflux, and DVT prophylaxis.  (Tr. 609.)

On April 1, 2013, while still admitted to the hospital, Plaintiff experienced acute chest pain on the left side that radiated to his back, difficulty breathing, and dizziness.  (Tr. 611.)  Plaintiff had moderate pain with palpation to his sternum that was not relieved with treatment.  (*Id*.)   Plaintiff was transferred to Banner Heart Hospital for further evaluation.  (*Id*.)  Cardiologists at Banner Heart Hospital concluded that Plaintiff's chest pain was due to dyspnea and adjusted his medications.  (Tr. 634.)

On May 10, 2013, Plaintiff sought treatment from Dr. Charles Richardson for right upper extremity DVT and suspected Paget Schroetter syndrome.   (Tr. 367.) Dr. Richardson noted that Plaintiff's migraines had improved with anticoagulation, but his insurance no longer covered "the Coumadin clinic at BBMC."  (*Id*.)  On May 17, 2013, Plaintiff reported to Dr. Richardson that he experienced "fullness in his neck and head" after ten minutes of exercise.  (Tr. 370.)  Dr. Richardson noted that Plaintiff's migraines improved with anticoagulation and that Plaintiff was on Coumadin.  (Tr. 370-71.)  Dr. Richardson continued Plaintiff's medications and referred him to a cardiologist, Dr. Arman Talle, for evaluation of his chest pain.  (Tr. 371.)  On May 30, 2013, Plaintiff saw Dr. Talle and had a myocardial perfusion study (stress test), which showed a fixed defect involving the apical wall consistent with attenuation artifact.  (Tr. 365.)

On June 2, 2013, Plaintiff went to the emergency room complaining of constant, sharp chest pain that began when he was resting.  (Tr. 637.)  Testing showed a small left epical pneumothorax.  (Tr. 646.)  At a cardiology follow-up appointment on July 3, 2013, Dr. Talle noted that Plaintiff had an abnormal ECG and recommended a screening for structural heart disease based on his history of a pulmonary embolism, upper extremity DVT, recent pneumothorax, and hospitalization.  (Tr. 366.)

On August 6, 2013, Plaintiff had a follow-up appointment with Dr. Richardson. (Tr. 373.)  Plaintiff reported that after leaving the hospital, his right upper extremity was swollen and painful.   (*Id*.)   Dr. Richardson diagnosed acute venous embolism and thrombosis of the deep veins of the upper extremity, spontaneous pneumothorax, and classic migraines.  (Tr. 374.)  He prescribed activity as tolerated, no heavy use of right arm, elevation of the right arm, and referred Plaintiff to a pulmonologist.  (*Id.*)

On August 25, 2013, Plaintiff went to the emergency room for syncope, arm pain, and arm swelling.  (Tr. 656.)  He was diagnosed with acute vasovagal syncope and acute neurovascular evaluations.  (Tr. 661.)  Discharge notes describe Plaintiff's condition as improved, stable, and guarded.  (*Id*.)

On referral from Dr. Richardson, on January 9, 2014, Plaintiff saw Brian Porvin, D.O., for chronic right axillary and brachial thrombosis.  (Tr. 432.)  Dr. Porvin referred Plaintiff for vascular surgery.  (Tr. 433.)  Dr. Porvin continued Plaintiff on anti-coagulation.  (*Id.*)  On March 18, 2014, Dr. Porvin noted that Plaintiff's insurance denied a CT scan of his chest.  (Tr. 430.)  Dr. Porvin advised Plaintiff to follow up with his vascular surgeon and to continue anticoagulation.  (Tr. 430-31.)

On April 3, 2014, Plaintiff saw Dr. Mitar Vranic, a vascular surgeon.  (Tr. 452.)  Plaintiff reported severe weakness and swelling in his right arm with minimal activity.  (Tr. 452.)  Plaintiff also complained of chills, sweats, fatigue, tinnitus, chest pain, nausea, vomiting, diarrhea, constipation, abdominal pain, cold intolerance, heat intolerance, and hay fever.  (Tr. 453.)  Dr. Vranic diagnosed DVT, hypertension, and carotid stenosis.  (Tr. 454.)  On April 13, 2014, Plaintiff went to the emergency room with chest pain that had been progressively worsening.  (Tr. 700.)  Plaintiff was prescribed medication and released.  (*Id.*)  On April 25, 2014, Plaintiff followed up with Dr. Vranic who reviewed a normal carotid ultrasound and right upper extremity venous ultrasound.  (Tr. 581.)  Dr. Vranic recommended a follow-up appointment in three months to review any changes and discuss Plaintiff's request to stop taking Coumadin.  (*Id.*)

On April 30, 2014, Plaintiff saw Dr. Arman Talle, a cardiologist, for review of his abnormal EKG and a screening for structural heart disease.  (Tr. 583.)  Dr. Talle refilled Plaintiff's prescriptions and recommended a follow-up with Dr. Vranic and follow up in one year with a cardiologist.  (*Id.*)

On July 21, 2014, Dr. Porvin reevaluated Plaintiff for chronic right upper extremity DVT with a history of pulmonary emboli, left sided pneumothorax and pulmonary nodules.  (Tr. 428.)  Dr. Porvin observed that Plaintiff had a "somewhat" depressed affect.  (*Id.*)  After examining Plaintiff, Dr. Porvin recommended discontinuing anticoagulation medications, and obtaining a CT scan of Plaintiff's chest in one year.  (Tr. 429.)  Dr. Porvin also evaluated Plaintiff for chronic right upper extremity DVT.  (Tr. 585.)

### B.  Opinion Evidence

#### 1.  Shelly Woodward, Ph.D

On September 4, 2013, Shelly Woodward, Ph.D, examined Plaintiff on referral from the Arizona Department of Economic Security Disability Determination.  (Tr. 421-24.)  Dr. Woodward reported that on examination Plaintiff had poor eye contact, but was cooperative.  (Tr. 423.)  His affect was "somewhat blunted."  (*Id.*)  His thought processes were logical and he had an average fund of knowledge.  (*Id.*)  His motor activity and speech were within normal limits.  (*Id.*)  Plaintiff was alert and oriented, had adequate abstracting ability, and could perform simple calculations and subtraction.  (*Id.*)  His immediate memory was intact, his intermediate memory was somewhat impaired, and his remote memory processes appeared intact.  (Tr. 423.)

Dr. Woodward completed a medical source statement.  (Tr. 425.)  She concluded that Plaintiff "may have difficulty remembering detailed instructions."  (*Id.*)  She opined that Plaintiff had "mild limitations in sustained concentration and persistence."  (*Id.*)  She concluded that "[m]ood symptoms may contribute to difficulty maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a constituent pace without an unreasonable number and length of rest periods."  (*Id.*)  Dr. Woodward also opined that Plaintiff "appear[ed] to have mild impairment in social interactions based on behavioral observations during the clinical interview."  (Tr. 426.)  She found that Plaintiff "may have difficulty working in coordination with or proximity to others without being distracted by them."  (*Id.*)  Dr. Woodward also found "evidence indicating that [Plaintiff] would have difficulty adapting to new or unfamiliar situations or environments . . . ."  (*Id.*)

#### 2.  Susan Sorosky, M.D.

In a September 23, 2014 letter, treating physician Dr. Susan Sorosky opined that Plaintiff was "medically stationary" beginning July 5, 2011, and could improve after twelve sessions of physical therapy per year, non-opiate medications, and repeat

radiofrequency ablations.  (Tr. 590.)  Dr. Sorosky opined that Plaintiff could lift up to twenty-five pounds.  (*Id.*)  Dr. Sorosky's opinion was based on Plaintiff's chronic left-sided low back pain, low hip pain, and posterior thigh pain due to lumbar spondylosis and facet arthropathy.  (*Id.*)

### III.    The Administrative Hearing

Plaintiff was thirty-six years old as of the alleged disability onset date.  (Tr. 103-04.)  He had a GED and vocational training in accounting.  (Tr. 64.)  Plaintiff's past relevant work included work as a plumber and account information clerk.  (Tr. 88.)  At the administrative hearing, Plaintiff testified that he stopped working in 2010 because of a back injury.  (Tr. 67-68.)  Plaintiff testified that he was unable to lift more than twenty-five pounds.  (Tr. 68.)  Plaintiff testified that he also suffered from DVT that impacted his right shoulder down to his right wrist.  (*Id.*)  Plaintiff testified that he experienced significant side effects from his medications including difficulty concentrating and sleeping.  (Tr. 70.)  Plaintiff stated that his doctors adjusted his medications to reduce side effects and, at the time of the administrative hearing, he was taking Propranlol and Tizanidne for migraines, Promethazine for nausea, Warfarin for blood clots, and ProAir for asthma.  (Tr. 70-72.)

Plaintiff testified that he had three to five migraines per week.  (Tr. 73.)  He stated that he started experiencing migraines on a regular basis in 2010 and they had increased in frequency and intensity.  (*Id.*)  Plaintiff testified that during the two years before the administrative hearing, Tizanidine and Propranlol reduced the frequency of his migraines from daily to three-to-five times weekly.  (Tr. 73-74.)  Plaintiff testified that on average his migraines lasted between twelve and thirty-six hours.  (Tr. 79-80.)  Plaintiff stated that to relieve a migraine, he rested in bed, used ice, and avoided light and noise.  (Tr. 80.)  Plaintiff testified that his migraines were triggered by increased activity, heavy lifting (over twenty-five pounds), and heat.  (Tr. 81.)

Plaintiff also testified that he had a constant, dull ache in his lower back that increased with activity.  (Tr. 75-76.)  To relieve the pain, Plaintiff testified that he laid on

his left or right side and frequently changed position.  (Tr. 76.)  Plaintiff testified that he had to shift his weight while sitting and could only sit for about fifteen minutes at one time.  (*Id.*) He could stand for about ten minutes at one time and walk for about twenty minutes at one time.  (Tr. 76, 82.)  Plaintiff's back pain interfered with his ability to do chores and he had to take breaks when washing the dishes or sweeping.  (Tr. 76-77.)

Plaintiff testified that he had suffered from IBS since 2010.  (Tr. 81.)  He had bowel movement "accidents" three-to-four times per month.  (*Id.*)  Plaintiff's gastroenterologist prescribed medication, but it did not relieve his symptoms.  (Tr. 82-83.)  Plaintiff also testified that he had uncontrolled muscle spasms in his legs and hand, which caused numbness, weakness, and loss of grip strength.  (Tr. 82.)

A vocational expert also testified at the administrative hearing.  (Tr. 88.)  The vocational expert testified that an individual who was limited to light work and who could occasionally climb, balance, stoop, kneel, crouch, and crawl, make only simple work-related decisions, and follow only simple instructions, could not perform Plaintiff's past relevant work or fast-paced production rate work, but could perform "full oriented work that would allow for some variability in work pace."  (Tr. 88.)  The vocational expert stated that an individual with those limitations could perform light, unskilled work as a locker room attendant, fast food worker, and survey worker.  (Tr. 89.)

The vocational expert testified that a person with those limitations, who was also limited to unskilled, sedentary work, would be able to perform the jobs of order clerk, charge account clerk, and callout operator.  (Tr. 89-90.)  The vocational expert stated that the positions of fast food worker and locker room attendant would expose an individual to heat above room temperature.  (Tr. 92.)  The vocational expert further testified that an individual who would miss one day of work per week would be unable to maintain employment.  (Tr. 93.)

## IV.    The ALJ's Decision

A claimant is considered disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).  To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that he is not presently engaged in a substantial gainful activity, and (2) that his medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and two, there are two ways in which he may be found disabled at steps three through five. At step three, he may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.    20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d).    If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four, the ALJ determines whether a claimant's RFC precludes him from performing his past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.   20 C.F.R. §§ 404.1520(g), 416.920(g).  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairments:

"gastroesophageal reflux disease (GERD); degenerative disc disease; history of headaches; history of left sided pneumothorax; status post right upper extremity deep venous thrombosis; status post pulmonary embolism; hypertension; [and] depressive disorder. (20 CFR 404.1520(c))." (Tr. 16.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (*Id*.) The ALJ found that Plaintiff had the RFC to "perform sedentary work as defined in 20 CFR 404.1567(b)." (Tr. 18.) The ALJ added that Plaintiff could "occasionally climb, balance, stoop, kneel, crouch, and crawl. He is limited to simple, routine, and repetitive work tasks involving simple, work related decisions and simple instructions." (*Id*.) The ALJ further opined that Plaintiff could not "do fast paced production rate work, but [could] perform goal-oriented work that allow[ed] for some variability in work pace." (*Id*.)

The ALJ determined that Plaintiff could not perform his past relevant work. (Tr. 22.) The ALJ concluded that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant number in the national economy that Plaintiff could perform. (Tr. 23.) Based on the vocational expert's testimony, the ALJ found that Plaintiff could perform work as an "[o]rder clerk, DOT 209.567-014, sedentary, SVP 2," a "[c]harge account clerk, DOT 205.367-014, sedentary, SVP 2", and a "[c]all out operator, DOT 237.367-014, sedentary, SVP 2." (Tr. 23.) The ALJ determined that Plaintiff had not been under a disability, as defined in the Act, from April 20, 2010 through the date of her decision. (Tr. 24.) Therefore, the ALJ denied Plaintiff's application for a period of disability and disability insurance benefits. (*Id*.)

## V.    Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence

and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).  The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

## VI.    Plaintiff's Claims

Plaintiff raises the following claims: (1) the ALJ erred in rejecting part of Dr. Woodward's opinion, (2) the ALJ erred in rejecting Plaintiff's reported symptoms; and (3) the ALJ erred by failing to fulfill her burden at step five of the sequential evaluation process.  (Doc. 16 at 1.)  In response, the Commissioner asserts that that ALJ's decision is free of harmful error and is supported by substantial evidence.  (Doc. 17.)

### A.      Weight Assigned to Dr. Woodward's Opinion

In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81

F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's opinion.  *Id*.  The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

Plaintiff argues that the ALJ erred by rejecting Dr. Woodward's opinion that Plaintiff may have difficulty working with others, and her opinion that Plaintiff would have difficulty adapting to new or unfamiliar situations or experiences.  (Doc. 16 at 17-18 (citing Tr. 22).)  Dr. Woodward was an examining physician.  However, her opinions about Plaintiff's limitations in social functioning and adaptation were contradicted by the opinion of state agency reviewing physician Jaine Foster-Valdez, Ph.D., who opined that Plaintiff was "not significantly limited" in those areas of functioning.   (Tr. 119.) Therefore, the ALJ was only required to give specific and legitimate reasons for discounting Dr. Woodward's opinions.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  Furthermore, even if the Court were to find that Dr. Woodward's opinions were uncontradicted, thus requiring the ALJ to provide clear and convincing

1    reasons to reject those opinions, the ALJ's reasons would satisfy that standard.  *See*

2    *Reddick,* 157 F.3d at 725.

3                    **1.     Difficulty Working with Others**

4            Plaintiff argues that the ALJ erred by rejecting Dr. Woodward's opinion that he

5    may have difficulty working with others.  (Doc. 16 at 17.)  The ALJ rejected this opinion

6    on the ground that it was "speculative" and "there [was] no evidence in the record to

7    establish any limitation in social functioning."  (Tr. 22.)  The ALJ noted that Plaintiff

8    reported that he got along with authority figures.  (*Id.* (citing Admin. Hrg. Ex. 7E at 7).)

9    The ALJ also noted that medical reports described Plaintiff as pleasant and cooperative.

10   (Tr. 22 (citing Admin. Hrg. Ex. 8F at 5).)  Plaintiff asserts that, contrary to the ALJ's

11   statement in her decision, there was record evidence that Plaintiff had difficulty getting

12   along with family, neighbors, and friends, and that he was unable to engage in social

13   events due to fear of soiling himself, not feeling well, or suffering from a migraine.

14   (Doc. 16 at 17 (citing Tr. 222).)

15          An ALJ "need not accept the opinion of any physician, including a treating

16   physician, if that opinion is brief, conclusory, and inadequately supported by clinical

17   findings."  *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (internal quotation

18   marks omitted).  Therefore, inconsistency with the record was a proper reason for the

19   ALJ to rejected Dr. Woodward's opinion.  *See* 20 C.F.R. §§404.1527(c)(4),

20   416.927(c)(4).  Substantial evidence in the record supports the ALJ's conclusion that

21   Dr. Woodward's opinion that Plaintiff may have difficulty working with others was

22   inconsistent with the record.  Plaintiff reported that he got along "very well" with

23   authority figures.  (Tr. 223.)  Additionally, medical providers frequently described

24   Plaintiff as pleasant and cooperative.  (Tr. 17, 22, 368, 371, 374, 436, 539, 541, 544.)

25   The record also includes conflicting evidence consisting of Plaintiff's reports that he had

26   difficulty getting along with family, neighbors, and friends because he was "irritable"

27   most days because he did not feel well.  (Tr. 222.)  Plaintiff also reported that he was

28   unable to engage in social events due to fear of soiling himself, not feeling well, or

suffering from a migraine.  (*Id.*)  The ALJ is responsible for resolving conflicts and ambiguities in the record.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  The ALJ reasonably concluded that the weight of the record did not support a finding that Plaintiff may have difficulty working with others.

The ALJ also rejected Dr. Woodward's opinion that Plaintiff may have difficulty working with others as speculative and, therefore, did not include a related limitation in the RFC. (Tr. 22.)  This is a legally sufficient reason for rejecting Dr. Woodward's opinion.   Dr. Woodward opined that Plaintiff "*may* have difficulty working in coordination with or proximity to others without being distracted by them."  (Tr. 426 (emphasis added).)  Dr. Woodward's equivocal opinion that Plaintiff *may* have difficulty is not a conclusion that Plaintiff *will* have social difficulty.   A claimant's "residual functional capacity is the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).   An ALJ need not include in the RFC mere recommendations or conditions under which a claimant's performance may be optimized.  *See Arnold v. Astrue*, 2012 WL 6025744, at *4-5 (D. Or. Dec. 4, 2012) (rejecting contention that ALJ was required to restrict claimant to working with sympathetic supervisors when a medical opinion indicated claimant would "do better" with a sympathetic supervisor).

The Court concludes that the ALJ gave legally sufficient reasons for rejecting Dr. Woodard's opinion that Plaintiff may have difficulty working with others and those reasons are supported by substantial evidence in the record.  Therefore, the ALJ did not err by rejecting that portion of Dr. Woodward's opinion.

## 2.     Difficulty Adapting to New or Unfamiliar Situations

The ALJ also rejected Dr. Woodward's opinion that "there was evidence indicating that [Plaintiff] would have difficulty adapting to new or unfamiliar situations or environments" (the adaptation opinion).  (Tr. 22, 426.)   The ALJ rejected this adaptation opinion as inconsistent with the record.  (Tr. 22.)  As previously noted, an ALJ need not accept the opinion of any physician if it is unsupported.  *See Chaudhry*, 688

F.3d at 671.   Here, Dr. Woodward cited Plaintiff's unemployment as a basis for her adaptation opinion.  (Tr. 426.)  The ALJ, however, noted that Plaintiff had worked since his alleged onset date.   (Tr. 22.)   The administrative record includes evidence that Plaintiff reported to medical providers that he worked in computer programming, had an associate's degree in accounting, and was employed.  (Tr. 15, 608, 632.)  Plaintiff also testified that he did odd plumbing jobs during the relevant period, including fixing faucets, and installing disposals and water heaters.  (Tr. 20, 64, 591.)

Plaintiff asserts that the ALJ erred in relying on this evidence because this work was not substantial gainful activity.  (Doc. 16 at 18.)  Even if this work was substantial gainful activity as defined by the Act, it is relevant to the ALJ's assessment of Dr. Woodward's adaptation opinion.  Evidence of Plaintiff's ability to adjust to different work environments during the relevant period, including "odd jobs" for various people (Tr. 64), indicates that that he had the ability to adapt to new or unfamiliar situations or environments and, therefore, supports that ALJ's rejection of Dr. Woodward's adaptation opinion.

The Court concludes that the ALJ gave legally sufficient reasons for rejecting Dr. Woodard's adaptation opinion and those reasons are supported by substantial evidence in the record.   Therefore, the ALJ did not err by rejecting that portion of Dr. Woodward's opinion.

**B.      Plaintiff's Subjective Complaints**

Plaintiff also argues that the ALJ did not provide valid reasons for discounting his subjective complaints.  (Doc. 16 at 18-22.)  An ALJ engages in a two-step analysis to determine whether to credit a claimant's subjective symptom testimony.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).   "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en

banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that he suffers from an underlying medical impairment that could reasonably be expected to produce his pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of his symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible.  *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).

Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting his symptom testimony about his headaches, lack of heat tolerance, and low back pain.  (Doc. 16 at 18-22.)  As set forth below, the Court concludes that the ALJ did not err by discounting this testimony.

### 1.    Headaches and Intolerance to Heat

Plaintiff testified that he had three to five migraines per week that made him nauseous and light sensitive.  (Tr. 72.)   Plaintiff also stated that heat triggers his migraines.  (Tr. 81.)  Plaintiff's migraines lasted twelve to thirty-six hours.  (Tr. 18, 73, 80.)  The ALJ discounted this testimony because she found that "the record did not establish headaches with the frequency or severity" that would preclude all work.  (Tr. 20.)  The ALJ also found that Plaintiff's headaches improved with anticoagulation medication.  (*Id.*)

An ALJ may properly discount a claimant's testimony if it is inconsistent with the record.  *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence."); SSR 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or an inconsistency between a claimant's subjective complaints and his diagnosed condition.").  Additionally, an ALJ may consider the types and effectiveness of the claimant's treatment.  *See* 20 C.F.R. § 404.1529(c)(3)(iv) ("The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" are relevant to the evaluation of a claimant's alleged symptoms.).  Thus, the ALJ properly considered the inconsistency between Plaintiff's subjective complaint testimony and the medical record when assessing Plaintiff's subjective complaints, and the record supports the ALJ's conclusion.

In August 2011, Plaintiff complained of a weekly headache aggravated by exercise and stress.  (Tr. 287.)  As the ALJ noted, at that time Dr. Mortazavi determined that Plaintiff did not need to take preventive medications, but should avoid triggers for his headaches.  (Tr. 20, 289.)  Plaintiff later complained of more significant migraines.  In April 2012, Plaintiff reported that he had up to two headaches a day (Tr. 331), and in

February 2013, Plaintiff reported having three to four headaches per week.  (Tr. 380.)  However, following hospitalization for deep vein thrombosis and pulmonary embolism in March 2013 (Tr. 609), Plaintiff began taking anticoagulation medication (Coumadin) and reported that his migraines had improved with that medication.  (Tr. 20, 367, 370, 376.)  The subsequent medical record does not include reports of intense or frequent headaches.  For example, in 2013 and 2014, Plaintiff complained of "slight" headaches in connection with an upper respiratory infection.  (Tr. 554, 680, 683.)

Here, as the ALJ noted in her decision, the administrative record indicates that Plaintiff initially received treatment for intense, frequent migraines in 2012 and early 2013.  Subsequent medical records indicate that starting in March 2013, Plaintiff's anticoagulation medication improved his symptoms.  The ALJ properly considered the effectiveness of treatment when assessing Plaintiff's subjective complaints.  *See Celaya v. Halter*, 332 F.3d 1177, 1181 (9th Cir. 2003) ("[T]he ALJ reasonably noted that the underlying complaints upon which her reports of pain were predicated had come under control.").  Therefore, the ALJ properly discounted Plaintiff's subjective complaints about his headaches based on evidence that Plaintiff's headaches improved with treatment.

The ALJ also stated that she discounted Plaintiff's testimony that he "could not be exposed to heat" on the ground that the record showed that Plaintiff was negative for heat intolerance.  (Tr. 20 (citing Admin. Hrg. Ex. 1F at 4).)  Plaintiff argues that this reason is not supported by the record because the ALJ cited a record related to a medical appointment about Plaintiff's GERD and abdominal pain, not headaches.  (Doc. 16 at 21.)  Therefore, Plaintiff argues that the ALJ erred by rejecting his symptom testimony about his headaches.  (*Id.* at 22.)

As the ALJ noted, Plaintiff repeatedly denied heat or cold intolerance to medical providers (Tr. 20, citing Tr. 239; *see also* Tr. 314, 370, 400, 443, 447, 538, 541, 551, 557, 560, 563.)   In his opening brief, Plaintiff cites to a single notation in Dr. Vranic's treatment notes indicating that Plaintiff complained of heat intolerance.  (Doc. 16 at 22

(citing Tr. 453).)  However, that single notation does not link Plaintiff's complaint of heat intolerance to headaches.   (Tr. 452-54.)   Additionally, Plaintiff denied "cerebral symptomatology" at that appointment.  (Tr. 452.)

Finally, even if the ALJ erred in rejecting Plaintiff's allegation that heat caused his migraines, that error would be harmless because the three jobs that the ALJ identified at step five do not include environmental conditions, including extreme heat.  *See* DICOT 209.567-014, 1991 WL 671794 (order clerk); DICOT 205.367-014, 1991 WL 671715 (charge account clerk); and DICOT 237.367-014, 1991 WL 672186 (call out operator).

### 2.   Low Back Pain

Plaintiff testified that he had mild to moderate low back pain that intensified to "high moderate to extreme" with prolonged activity, extended periods of standing, sitting more than fifteen minutes, or lifting over twenty pounds. (Tr. 19.)  Plaintiff also testified that squatting, bending, kneeling for long periods, and reaching overhead hurt his lower back.  (*Id.*)  The ALJ discounted Plaintiff's subjective complaints about his back pain because she found that the medical examinations did not show significant physical limitations, Plaintiff's daily activities were inconsistent with his alleged physical limitations, and Plaintiff worked consistently after the alleged disability onset date. (Tr. 20-21.)

Plaintiff does not specifically challenge any of the ALJ's stated reasons supporting her decision to discount Plaintiff's subjective complaints about his low back pain. (Doc. 16 at 20-22.)  Rather, Plaintiff asserts that he complained of chronic back pain due to disc bulges, his finances prevented him from getting further treatment for his pain, and doctors increased his medication and recommended follow-up with a pain management doctor and a neurologist.   (Doc. 16 at 21 (citing Tr. 386, 379).)   Plaintiff refers to evidence in the medical record without any explanation for why that evidence supports his assertion that the ALJ erred by discounting his subjective complaints related to his low back pain.  Plaintiff's conclusory allegations are insufficient to support his claim of error.  *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting

conclusory assertion that ALJ failed to consider whether claimant met listings of impairments because the claimant provided no analysis of relevant law or facts regarding listings); *Perez v. Barnhart*, 415 F.3d 457, 462 n.4 (5th Cir. 2005) (argument waived by inadequate briefing); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir.1994) (perfunctory statements fail to frame and develop issue sufficiently to invoke appellate review).

Additionally, the Court finds that the ALJ's reasons for discounting Plaintiff's subjective complaints related to his low back pain are legally sufficient and supported by substantial evidence in the record. As the ALJ noted, there were mild findings on Plaintiff's imaging studies. (Tr. 19 (citing Admin. Hrg. Ex. 6F at 14).) Plaintiff frequently had normal physical examinations including normal range of motion, alignment, gait and station, and muscle strength and tone. (Tr. 20 (citing Admin. Hrg. Exs. 1F at 12, 3F at 14, 8F at 5, 13F at 2, 16F at 5, 20F at 4, 22F at 21).) Additionally, Plaintiff worked and took care of his daughter after the alleged onset date. (Tr. 20-21 (citing Adin. Hrg. Ex. 14F at 2).) These are valid reasons for discounting Plaintiff's subjective complaints. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (explaining that the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"); *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (upholding credibility finding where "[t]he ALJ noted evidence that after his surgery Greger was 'active with yard work, work around the house, and that he was able to continue his past work activities as a contractor'"); *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("[e]ven when [reported] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment").

As set forth above, the ALJ provided legally sufficient reasons that are supported by substantial evidence in support of her assessment of Plaintiff's subjective complaints and, therefore, the Court affirms that determination. Additionally, if the ALJ erred by rejecting Plaintiff's subjective complaint of heat intolerance, that error was harmless.

### C.       Step-Five Analysis

In his final claim, Plaintiff asserts that the ALJ erred at step five of the sequential evaluation process by finding Plaintiff not disabled based on jobs that exceeded Plaintiff's RFC.  (Doc. 16 at 22.)  The Court agrees that the ALJ erred at step five.

At step five the ALJ has the burden of identifying specific jobs that a claimant can perform considering his RFC, age, education, and work experience.   20 C.F.R. § 404.1520(g).   An ALJ may not rely on the vocational expert's testimony without determining whether it conflicts with the Dictionary of Occupational Titles (DOT) and obtaining a reasonable explanation for any apparent conflict.  *See Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  "When there is an apparent conflict between the vocational expert's testimony and the DOT — for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle —  the ALJ is required to reconcile the inconsistency."  *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015).  If the ALJ relies on a vocational expert's testimony that contradicts the DOT, the record must contain "persuasive evidence to support the deviation."  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).  "[I]n order for an ALJ to rely on a job description in the [DOT] that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation."  *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001).

At step five of the sequential evaluation process, the ALJ relied solely upon the vocational expert's testimony to conclude that Plaintiff could perform work as an order clerk, DOT 209.567-014, charge account clerk, DOT 205.367-014, and a call out operator, DOT 237.367-014.  (Tr. 23.)  Plaintiff asserts that all three jobs require a person to follow detailed instructions and to perform at a higher reasoning level than is permitted by his RFC, which limited Plaintiff to simple work tasks and simple decisions and instructions.  (Doc. 16 at 22, Tr. 18.)  Citing *Zavalin*, Plaintiff asserts that the ALJ erred by failing to resolve the apparent conflict between the DOT and the vocational expert's testimony.

The Ninth Circuit has held that "there is a conflict between the [RFC] to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *See Zavalin*, 778 F.3d at 847. Jobs with Level 3 reasoning require a person to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. DICTOT, App. C, 1991 WL 688702; *see also Zavalin*, 778 F.3d at 847. In *Zavalin*, the court held that "it may be difficult for a person limited to simple, repetitive tasks to follow instructions in 'diagrammatic form' as such instructions can be abstract." *Id.* at 847.

As Plaintiff asserts, the jobs of order clerk, DOT 209.567-014, charge account clerk, DOT 205.367-014, and call out operator, DOT 237.367-014, require Level 3 reasoning abilities. *See* DICOT 209.567-014, 1991 WL 671794 (order clerk); DICOT 205.367-014, 1991 WL 671715 (charge account clerk); and DICOT 237.367-014, 1991 WL 672186 (call out operator). Thus, there is an apparent conflict between Plaintiff's RFC limitation to simple work tasks and the Level 3 reasoning requirements of those three jobs. The ALJ, however, did not recognize this inconsistency, did not ask the vocational expert to explain the apparent conflict, and did not otherwise reconcile the conflict. (Tr. 23, 88-90, 93-94.) The ALJ's failure to do so was error. *See Rounds v. Comm'r*, 807 F.3d 996, 1003 (9th Cir. 2015) (concluding that ALJ erred by failing to reconcile conflict between the claimant's RFC and the level of reasoning required for jobs the ALJ found the claimant could perform).

The Commissioner argues that the error was harmless because substantial evidence in the record indicates Plaintiff could perform the jobs the ALJ identified at step five. (Doc. 17 at 12.) The Commissioner cites to evidence that Plaintiff scored 93% on a mini-mental status examination, reported that he had an associate's degree in accounting, fixed faucets, installed water heaters, and worked in computer programming during the relevant period. (Doc. 17 at 12 (citing Tr. 15, 64, 423, 591, 608).) The Commissioner, however, does not discuss DOT's descriptions of the three jobs the ALJ relied upon at step five of her decision, or explain how the record evidence the Commissioner cites

indicates that Plaintiff could perform those jobs. Regardless, the Court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Zavalin*, 778 F.3d at 848. The Court concludes that the ALJ failed to reconcile the apparent conflict between Plaintiff's RFC and the demands of Level 3 reasoning required for the three jobs that the ALJ found Plaintiff could perform, and that this error was not harmless. *See Rounds*, 807 F.3d at 1003. Therefore, the Court remands for further proceedings. On remand, the ALJ must determine whether there is a reasonable explanation to justify relying on the vocational expert's testimony that Plaintiff could perform jobs that conflicted with Plaintiff's RFC. *See Tommassetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) ("[A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.'") (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)).

## VII. Conclusion

The Court concludes that the ALJ erred at step five of the sequential evaluation process by failing to reconcile the apparent conflict between Plaintiff's RFC limiting him to simple work tasks "involving simple, work related decisions and simple instructions" (Tr. 18), and the Level 3 reasoning required for the jobs of order clerk, DOT 209.567-014, charge account clerk, DOT 205.367-014, and call out operator, DOT 237.367-014, that the ALJ concluded Plaintiff could perform. (Tr. 23.) Therefore, the Court reverses the ALJ's step-five decision. The Court otherwise affirms the ALJ's decision.

Accordingly,

**IT IS ORDERED** that the Court affirms in part, reverses in part, and remands this matter to ALJ for further proceedings consistent with this decision.

/ / /

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and terminate this case.

Dated this 24th day of March, 2017.


_____

Bridget S. Bade
United States Magistrate Judge